USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10_/_16_/_2012_ (4)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————

F.L., by his parents, F.L. and M.L.,

              Plaintiffs,

    v.

NEW YORK CITY DEPARTMENT OF
EDUCATION,

              Defendant.

————————————————————

Before: Richard K. Eaton, Judge[*]

Court No. 11-Civ-5131 (RKE)

## OPINION AND ORDER

Eaton, Judge:  This case involves an effort by the plaintiffs, F.L. and his parents, to overturn the findings of two administrative proceedings, each of which found that F.L. had been provided with a Free Appropriate Public Education ("FAPE") within the meaning of the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1412 (2006). Before the court are plaintiffs' motion for a modified de novo review of, and appeal from, the June 6, 2011 Decision of a State Review Officer ("SRO"), as well as defendant's cross-motion for summary judgment on plaintiffs' claim for reimbursement for private school costs pursuant to IDEA. 20 U.S.C. § 1415. The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (2006).

For the reasons set forth herein, plaintiffs' motion for modified de novo review (ECF Dkt. No. 8) is DENIED, defendant's motion for summary judgment (ECF Dkt. No. 13) is GRANTED, and the State Review Officer's decision is sustained.

———————————————

[*]    Judge Richard K. Eaton, of the United States Court of International Trade, sitting by designation.

BACKGROUND[1]

Plaintiff F.L. is a male child with autism, and is represented in this case by his parents,

plaintiffs F.L. and M.L.  Def.'s Local Rule 56.1 Statement of Undisputed Material Facts ¶ 1

("Def.'s 56.1 Stmt.").[2]  To assess F.L.'s educational needs, and develop a program in accordance

with those identified needs, defendant, the New York City Department of Education (the

"Department" or "defendant"), convened a Committee on Special Education[3] ("CSE" or "IEP

---

[1]      **Glossary of Acronyms**: As in other IDEA cases, the court finds it useful to supply a list of the acronyms used in this opinion.  *See M.H. & E.K. ex rel. P.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 223 n.1 (2d Cir. 2012) ("This opinion, dealing as it does with the IDEA and practices thereunder, is replete with acronyms."); *see also R.K. ex rel. R.K. v. N.Y.C. Dep't of Educ.*, 09-CV-4478, 2011 WL 1131492, at *1 n.1 (E.D.N.Y. Jan. 21, 2011), *adopted by*, 2011 WL 1131522 (E.D.N.Y. Mar. 28, 2011), *aff'd*, 2012 WL 4125833 (2d Cir. Sept. 20, 2012) (providing "a compilation of many of the acronyms used in [that] opinion").

| | |
|---|---|
| ABA | Applied Behavioral Analysis: a teaching methodology for children with autism |
| BIP | Behavior Intervention Plan: a plan developed to address problem behaviors |
| CSE | Committee on Special Education: the team responsible for creating the IEP |
| FAPE | Free Appropriate Public Education: educational program and related services mandated by IDEA for children with disabilities |
| FBA | Functional Behavior Assessment: an assessment of a child's interfering behaviors |
| IDEA | Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. |
| IEP | Individualized Education Plan: customized education plan developed for a child with a disability |
| IHO | Impartial Hearing Officer |
| RSA | Related Services Authorization |
| SRO | State Review Officer |
| TEACCH | Treatment and Education of Autistic and Related Communication-Handicapped Children: a teaching methodology for children with autism |

[2]      The court has taken the facts from the parties' Rule 56.1 statements and the administrative record.  Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no admissible evidence to controvert the fact.

[3]      In New York State, responsibility for developing IEPs is assigned to local CSEs, which "are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others."  *R.E. v. N.Y.C. Dep't of Educ.*, Nos. 11-

team") to create an Individualized Education Plan ("IEP")[4] for F.L. Def.'s 56.1 Stmt. ¶ 3. This

IEP team met on May 14, 2009, and consisted of M.L., Department psychologist Kathy

Kaufman, Department special education teacher Carol Schaecht, and three representatives of the

McCarton School, F.L.'s then-current educational placement. Def.'s 56.1 Stmt. ¶¶ 3, 4; Pls.'

Mem. of Law in Supp. of Mot. for Modified De Novo Review, Ex. D, at 2 ("Pls.' Mem.") (ECF

Dkt. No. 9). This meeting lasted over two hours. Impartial Hr'g Office Tr. *in re F.L.*, Case No.

126676, at 69 ("Tr."). The IEP team discussed and developed a program intended to provide

F.L. with appropriate educational services. Def.'s 56.1 Stmt. ¶¶ 4–9.

   The IEP team recommended a 6:1:1 program, which is a placement in a class with six

students, one special education teacher, and one classroom paraprofessional. Def.'s 56.1 Stmt. ¶

9; Pls.' Mem. Ex. D, at 9. In addition, the IEP team recommended that an individual behavior

management paraprofessional be assigned full-time specifically to F.L. Def.'s 56.1 Stmt. ¶ 9;

Pls.' Mem. Ex. D, at 9. The IEP team also recommended that F.L. receive weekly "related

services," including four one-hour individual speech/language therapy sessions, one one-hour

speech/language therapy session in a group of two, and five forty-five minute occupational

therapy sessions. Pls.' Mem. Ex. D, at 9. The IEP team did not discuss a specific school site for

the implementation of this program. Def.'s 56.1 Stmt. ¶ 8.

   Kaufman and Schaecht took notes at the IEP meeting and later converted them into the

IEP and a Behavior Intervention Plan ("BIP"). Def.'s 56.1 Stmt. ¶ 4. On June 11, 2009, the

---

1266-cv, 11-1474-cv, 11-655-cv, 2012 WL 4125833, at *2 (2d Cir. Sept. 20, 2012) ("*R.E. II*")
(citing N.Y. Educ. Law § 4402(1)(b)(1)(a) (McKinney 2010)).

[4]      "The IEP is 'a written statement that sets out the child's present educational
performance, establishes annual and short-term objectives for improvements in that performance,
and describes the specially designed instruction and services that will enable the child to meet
those objectives.'" *R.E. II*, 2012 WL 4125833, at *1 (quoting *D.D. ex rel. V.D. v. N.Y.C. Bd. of
Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006)).

Department sent F.L.'s parents a letter offering F.L. a specific school placement in P.S. 138 at 144 East 128th Street in Manhattan for the 2009–2010 school year, and providing the contact information of a placement officer who could be reached to discuss the recommended school, or to request another IEP meeting. Def.'s 56.1 Stmt. ¶ 13. The IEP was to go into effect on July 1, 2009. Pls.' Mem. Ex. D, at 2.

P.S. 138, part of New York City's District 75, offers special education and related services using the Treatment and Education of Autistic and Related Communication-Handicapped Children ("TEACCH") methodology. Pls.' Administrative Record Ex. N, at 3 ("Admin. R."); Tr. 117–18. It also offers speech therapy, occupational therapy, parent training, and transition services. Pls.' Mem. Ex. F, at 2–3; Def.'s 56.1 Stmt. ¶ 12, 18, 22; Tr. 127–29, 135–38, 189, 264, 352–54. Related services, such as speech/language and occupational therapy, are provided in accordance with a three-step process. First, the school attempts to provide the services with in-house staff. Tr. 362. Second, if the in-house services are unsatisfactory, the school will contract with outside therapists to provide the services in the school. Tr. 362. Third, if the first two options are inadequate, the school will work with the student's parents to have the services provided outside of the school environment by external therapists. Tr. 362–63, 416–20.

On June 22, 2009, F.L.'s mother, M.L., visited P.S. 138 for approximately one and a half hours. Def.'s 56.1 Stmt. ¶ 36; Tr. 804. On June 23, 2009, plaintiffs informed the Department by letter that they were rejecting the proposed school placement, were enrolling F.L. in the McCarton School, and were requesting reimbursement for his enrollment expenses. Def.'s 56.1 Stmt. ¶ 37; Admin. R. Ex. I, at 1–2. On March 3, 2010, plaintiffs filed a Demand for Due

4

Process[5] with the Impartial Hearing Office pursuant to 20 U.S.C. § 1415.  Admin. R. Ex. A.  On May 13, 2010, an Impartial Hearing Officer ("IHO") issued an amended Order on Pendency requiring the Department to pay for F.L.'s then-current placement at the McCarton School from March 3, 2010 until the resolution of plaintiffs' complaint.  Hr'g Officer's Order on Pendency, Case No. 126676 (May 13, 2010).

The McCarton School is a not-for-profit, private school for the education of children with autism.  Pls.' Local Rule 56.1 Statement of Material Facts ¶ 3 ("Pls.' 56.1 Stmt.") (ECF Dkt. No. 10).  Education is provided in accordance with the Applied Behavioral Analysis ("ABA") methodology, and there are often eight to ten instructors in a single classroom with six students.  Pls.' 56.1 ¶ 30; Tr. 827–28.  The school offers an intensive 1:1 education, which is a placement in a class with six students, a head teacher, and an individual ABA teacher for each student.  Pls.' 56.1 ¶ 3; Tr. 523–24.  It also offers speech/language therapy and occupational therapy.  Pls.' 56.1 ¶ 3.  The McCarton School has not been approved by the New York State Department of Education as an education provider for students with disabilities.  Def.'s 56.1 ¶ 40.

Beginning on May 10, 2010, the IHO commenced an extensive administrative hearing, generating a transcript of nearly one thousand pages, and admitting dozens of documents into evidence.  Hr'g Officer's Findings of Fact & Decision, Case No. 126676, at 24–26 (Feb. 15, 2011) ("IHO Decision").  Several public school employees testified as to the procedures

---

[5]  A "Demand for Due Process" is "a type of administrative challenge unrelated to the concept of constitutional due process," which a parent may file "[i]f a parent believes that his child's IEP does not comply with the IDEA."  *R.E. II*, 2012 WL 4125833, at *2.  Furthermore, "[a]n important feature of the IDEA is that it contains a statutory 30-day resolution period once a 'due process complaint' is filed."  *Id.* at *14 (citing 20 U.S.C. § 1415(f)(1)(B)).  During the resolution period, the Department may remedy the deficiencies listed in the complaint without penalty.  *Id.*  "If, at the end of the resolution period, the parents feel their concerns have not been adequately addressed and the amended IEP still fails to provide a FAPE, they can continue with the due process proceeding and seek reimbursement."  *Id.*

followed in selecting F.L.'s school placement at P.S. 138, the appropriateness of the offered

placement, and the offered school's ability to provide the services required in F.L.'s IEP. IHO

Decision at 1–3. Members of the McCarton School staff testified as to F.L.'s specific needs and

how they were being fulfilled at the school. Tr. 474–502, 503–47, 826–55, 856–907. F.L.'s

mother, M.L., testified as to F.L.'s specific needs, her involvement in the development of the

IEP, and her impressions of the adequacy of the Department's offered school placement at P.S.

138. Tr. 77–816.

Based on this hearing record, on February 15, 2011, the IHO issued his Findings of Fact

and Decision. The IHO found that the Department had offered F.L. a FAPE, but that it "did not

fulfill its requirements to supply a FAPE in the provision of . . . related services." IHO Decision

22. Accordingly, the IHO denied F.L.'s parents reimbursement for F.L.'s education at

McCarton, but granted them reimbursement for related services payments made in 2009–2010.

IHO Decision 22. Because the IHO found that the Department had provided a FAPE, he

addressed neither the appropriateness of the parents' unilateral private school placement nor the

balance of the equities.[6]

Plaintiffs appealed the IHO decision to a State Review Officer pursuant to 20 U.S.C. §

1415(g). Appl. of a Student with a Disability, Appeal No. 11-032, at 1 (June 6, 2011) ("SRO

Decision"). Based on a review of the IHO hearing record, the SRO agreed that the Department

had, in fact, offered F.L. a FAPE. SRO Decision at 26. Thus, he upheld that portion of the

---

[6]     As is discussed in further detail in this opinion, under the three-prong
*Burlington/Carter* test, which courts must use to determine whether the parents of a disabled
child are entitled to reimbursement of private school costs under IDEA, if the court determines
that the school district has, in fact, provided a FAPE under the first prong, it need not proceed to
the second prong, the appropriateness of the private school placement, nor the third prong, the
balance of the equities. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7
(1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).

IHO's decision. The SRO, however, reversed the IHO on the provision of related services, finding that the Department was "'ready, willing and able' to implement the student's IEP." SRO Decision at 25. Accordingly, the SRO denied F.L.'s parents reimbursement for both F.L.'s tuition at McCarton and the related services payments made in 2009–2010.

Plaintiffs now appeal the SRO decision to this court pursuant to 20 U.S.C. § 1415(i). Although the Department has previously reimbursed F.L.'s parents' educational expenses at McCarton, including those expenses incurred after March 3, 2010 when the pendency of these proceedings began, the amount the parents paid between September 1, 2009 and March 3, 2010 remains unreimbursed. Pls.' Letter Br. of July 19, 2012, at 1 (ECF Dkt. No. 31); Def.'s Letter Br. of July 13, 2012, at 3 (ECF Dkt. No. 28). Were plaintiffs to prevail, this outstanding amount would be owed to them.

STANDARD OF REVIEW

This case is before the court on plaintiffs' motion for modified de novo review and defendant's cross-motion for summary judgment. Neither a de novo standard nor a summary judgment standard, however, accurately describes the standard of review in this case. On a motion for summary judgment in an IDEA case, "'the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion].'" *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

Review of state administrative decisions under IDEA is based on the court's independent review of the administrative record using a preponderance of the evidence standard. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley ex rel. Rowley*, 458 U.S. 176, 206 (1982). However, "the provision that a reviewing court base its decision on the 'preponderance of the

7

evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of school authorities which they review." *Id.* Congress has provided procedural safeguards in IDEA regarding the preparation of IEPs that "would be frustrated if a court were permitted simply to set state decisions at nought." *Id.*

The Second Circuit "strictly limit[s] judicial review of state administrative decisions." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380–81 (2d Cir. 2003); *see also R.E. v. N.Y.C. Dep't of Educ.*, Nos. 11-1266-cv, 11-1474-cv, 11-655-cv, 2012 WL 4125833, at *11 (2d Cir. Sept. 20, 2012) ("*R.E. II*") (Federal courts "must defer to the administrative decision because 'the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'") (quoting *A.C. & M.C. ex rel. M.C. v. Bd. of Educ. Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)). The Second Circuit cautions that courts should not overturn administrative determinations lightly because "the purpose of the IDEA is to provide funding to states so that *they* can provide a decent education for disabled students consistent with their traditional role in educating their residents." *M.H.*, 685 F.3d at 244 (citing *Rowley*, 458 U.S. at 208 n.30).

Furthermore, the Second Circuit recently identified certain factors that will affect the amount of deference granted to administrative determinations. First, "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *M.H.*, 685 F.3d at 244. Second, "[d]ecisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress." *Id.* Third, "[d]eterminations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." *Id.* Finally,

8

"the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency." *Id.*

Furthermore, it is the SRO's decision that may be given more weight, rather than that of the IHO:

> Courts generally defer to the final decision of the state authorities, even when the reviewing authority disagrees with the hearing officer. If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight. Deference is particularly appropriate when . . . the [SRO's] review has been thorough and careful.

*Id.* at 241 (quoting *A.C.*, 553 F.3d at 171; *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)) (internal quotation marks omitted).

Ultimately, judicial review of administrative determinations under the IDEA requires the court (1) to conduct an independent review of the administrative record, (2) use a preponderance of the evidence standard, and (3) give deference to the administrative determinations, particularly that of the SRO.

## DISCUSSION

### I. Legal Framework

Under the IDEA, as a condition of receiving federal special education funding, states are required to provide all students with a Free Appropriate Public Education.[7] 20 U.S.C. § 1412; *see also R.E. II*, 2012 WL 4125833, at *1 ("A state receiving federal funds under the IDEA must provide disabled children with a [FAPE]. To ensure that qualifying children receive a FAPE, a school district must create an [IEP] for each such child."). In New York, the duty to provide a

---

[7]     As described by the Supreme Court, "[t]he 'free appropriate public education' required by the [IDEA] is tailored to the unique needs of the handicapped child by means of an 'individualized educational program' [i.e., an IEP]." *Rowley*, 458 U.S. at 181.

9

FAPE falls to the local Department of Education. N.Y. Comp. Codes R. & Regs. tit. 8, § 200.2 (2012). Parents who do not believe that the local Department has offered their child a FAPE may seek reimbursement for the cost of private school enrollment for their children. 20 U.S.C. § 1415(d). Under the IDEA, parents are entitled to a local-level hearing with an IHO, a state-level review of the IHO's decision by a SRO, and—if dissatisfied with the SRO's decision—review in federal or state court. 20 U.S.C. § 1415(f)–(g), (i). During the pendency of these proceedings, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement" and the Department is responsible for the cost of that education. 20 U.S.C. § 1415(j).

Even if the Department is ultimately found to have offered the student a FAPE, the amount dispersed during the pendency of the proceedings cannot be recovered from the plaintiffs. *R.L. & A.Z. ex rel. E. Z.-L. v. N.Y.C. Dep't of Educ.*, 763 F. Supp. 2d 584, 599, *aff'd*, 2012 WL 4125833 (2d Cir. Sept. 20, 2012) (denying the school district recoupment of pendency payments it made although the district was found to have offered the student a FAPE) (citing *Mackey v. Bd. of Educ.*, 386 F.3d 158, 160–61 (2d Cir. 2004) ("Section 1415(j) represents Congress' policy choice that all handicapped children, *regardless of whether their case is meritorious or not*, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." (citations and internal quotation marks omitted))).

To determine whether the parents of a disabled child are entitled to reimbursement of private school costs under IDEA, courts must engage in a three-prong inquiry known as the *Burlington/Carter* test. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985). "Courts considering a

reimbursement request for the cost of private special education services must consider (1) whether 'the school district [has] fail[ed] to provide a FAPE'; (2) whether 'the private school placement is appropriate'; and (3) whether the 'equities' warrant a reimbursement award in full or in part." *Mr. & Mrs. A ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d 403, 408 (S.D.N.Y. 2011) (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009)).

A determination as to whether a FAPE has been provided ("Prong I") requires the consideration of two factors: "First, the district court should ask whether the State has complied with the 'procedures set forth by the act.' And, second, the court should decide whether 'the [IEP] developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits.'" *M.H.*, 685 F.3d at 242 (citing *Rowley*, 458 U.S. at 206–07); *see also R.E. II*, 2012 WL 4125833, at *16 ("In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive. At the first step, courts examine whether there were procedural violations of the IDEA, namely, 'whether the state has complied with the procedures set forth in the IDEA.' Courts then examine whether the IEP was substantively adequate, namely, whether it was 'reasonably calculated to enable the child to receive educational benefit[s].'" (citations omitted)).

When considering the first Prong I factor, procedural compliance, procedures must include:

> [a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a [FAPE] to such child, and to obtain an independent educational evaluation of the child.

20 U.S.C. § 1415(b)(1). Furthermore,

> if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded

11

the student's right to a FAPE, (b) significantly impeded the parents' opportunity
to participate in the decision-making process regarding the provision of a FAPE to
the student, or (c) caused a deprivation of educational benefits.

*M.P.G. ex rel. J.P. v. N.Y.C. Dep't of Educ.*, No. 08 Civ. 8051, 2010 WL 3398256, at *2

(S.D.N.Y. Aug. 27, 2010) (citing 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2)).

Furthermore, "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE

even if the violations considered individually do not." *R.E. II*, 2012 WL 4125833, at *16.

With regard to the second Prong I factor, substantive adequacy,

for an IEP to be reasonably calculated to enable the child to receive educational
benefits, it must be likely to produce progress, not regression. A valid IEP should
provide the opportunity for more than trivial advancement, such that the door of
public education is opened for the disabled child in a meaningful way.

*D.F. & D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 598 (2d Cir. 2005) (internal

citations and quotation marks omitted). This inquiry has come to be known as the "reasonably

calculated" test. If the Department can demonstrate that it followed the IDEA's procedures and

that its IEP was "reasonably calculated" to provide the student with educational benefits, it will

have carried its burden, and Prongs II and III need not be addressed. If the Department has not

offered the student a FAPE, the appropriateness of the parents' unilateral private school

placement must be considered under Prong II.

As has been noted, Prong II of the *Burlington/Carter* test requires a determination as to

whether the private school placement is appropriate. When considering the appropriateness of

the parents' unilateral placement, the question is again whether that placement's program was

"reasonably calculated" to confer educational benefits on the student. *Frank G. v. Bd. of Educ.*,

459 F.3d 356, 364 (2d Cir. 2006). If a court finds that the Department failed to offer the student

a FAPE, and that the parents' unilaterally-selected program is "reasonably calculated" to confer

educational benefits, it must then weigh the equities under Prong III to ascertain whether

12

reimbursement is warranted.  For instance, "a reimbursement award may be reduced or denied if the parents fail . . . to timely notify the school district of their intent to enroll the child in a private school at public expense; fail to make their child available for an evaluation; or otherwise act unreasonably." *A.D. & M.D. ex rel. E.D. v. Bd. of Educ. of City Sch. Dist.*, 690 F. Supp. 2d 193, 215 (S.D.N.Y. 2010) (citing 20 U.S.C. § 1412(a)(10)(C)(iii)).

## II.  Plaintiffs' Reimbursement Claim

Plaintiffs argue that: (1) the Department failed to offer F.L. a Free Appropriate Public Education, both procedurally and substantively; (2) the McCarton program was reasonably calculated to provide F.L. with educational benefits, and was thus appropriate; and (3) the equities favor the parents.

### A.  Procedural Compliance

Plaintiffs assert that defendant failed to follow the IDEA's procedural requirements, thereby depriving them of meaningful participation in the IEP meeting, by (1) failing to conduct a Functional Behavior Assessment ("FBA"), and failing to develop a Behavior Intervention Plan ("BIP") at the IEP meeting; (2) by not considering the use of the ABA methodology to which F.L. is accustomed, rather than the TEACCH methodology used at P.S. 138; (3) by not discussing or developing a transition plan; (4) by not discussing or offering parent training or counseling; and (5) by not including F.L.'s parents in the selection of a specific school placement.  Pls.' Mem. 13–15.

First, plaintiffs argue that defendant failed to conduct the required FBA[8] or to develop a BIP during the IEP meeting. They make their claim even though both the SRO and the IHO found that the IEP team used information akin to a FBA to develop the BIP included in F.L.'s IEP. SRO Decision 14–15 ("When developing an IEP, if a student's behavior impedes his or her learning or the learning of others, the CSE must 'consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior' when developing, reviewing, and revising an IEP. With regard to the parents' contention that the district failed to conduct an FBA and that it developed the student's BIP after the CSE meeting without parental participation, . . . the hearing record fails to support their allegation.") (citations omitted); *see also* IHO Decision 20 ("[T]he fact that the IEP team did develop a BIP based on McCarton School documents that appear[] to address the child's behavior appropriately negates the absence of an FBA as a fatal flaw to the IEP process.").

As the Second Circuit has recently reiterated, "failure to conduct an FBA is a procedural violation, but that it does not rise to the level of a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it." *R.E. II*, 2012 WL 4125833, at *16 (citing *A.C.*, 553 F.3d at 172). Here, the SRO found that the BIP was proper because it was developed with information akin to a FBA, and with meaningful parental participation. SRO Decision 15 ("The school psychologist further testified that the information provided by

---

[8]       Under the New York Regulations, the Department must conduct an FBA for a student "whose behavior impedes his or her learning or that of others." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v). An FBA includes "the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior . . . and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it." *Id.* § 200.1(r).

McCarton staff was sufficient to develop an appropriate BIP for the student because McCarton staff was familiar with the student's behavior.").

Thus, even when one is required,[9] the failure to conduct a FBA will not render an IEP legally inadequate where, as both the IHO and SRO found here, the IEP adequately addresses the student's problem behavior through a BIP. *See R.E. II*, 2012 WL 4125833, at *17 ("The failure to conduct an FBA will not always rise to the level of a denial of a FAPE, but when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors.") (citing *A.C.*, 553 F.3d at 172 ("The preponderance of the evidence supports the SRO's decision that the IEP adequately addressed [the student's] behavior, and the sufficiency of [the school's] strategies for dealing with this behavior 'is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.'" (quoting *Grim*, 346 F.3d at 382))).

Plaintiffs also claim that the BIP attached to the IEP "was underlined unilaterally created by defendant after the IEP meeting was held," and that this creates a FAPE deprivation in and of itself. Pls.' Mem. 13. According to both the IHO and SRO decisions, the FBA (or its equivalent), the BIP, and the IEP were developed with parental input at the May 2009 IEP meeting, which F.L.'s mother attended as a member of the IEP team, and were subsequently drawn up based on the minutes of that meeting. Pls.' Mem. Ex. D; SRO Decision 15 ("[T]he hearing record illustrates that the BIP was developed with both information akin to an FBA and with meaningful parental participation. There is no need to disturb the [IHO's] conclusion with

---

[9]     It is not entirely clear that a FBA was required in this case because FBAs are typically required only as part of an initial evaluation, N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v), or as a response to disciplinary actions attributable to conduct found to be a manifestation of the student's disability, *id.* § 201.3. The IEP in this case results from an annual review rather than an initial evaluation or discipline referral. Pls.' Mem. Ex. D, at 2. Defendant, however, does not dispute the necessity of the FBA.

respect to the parents' claims regarding the absence of a formal FBA or the process of

developing the student's BIP."); IHO Decision 20. Both of these findings are confirmed by

substantial evidence on the record. The BIP is included as part of the IEP. Pls.' Mem. Ex. D, at

10. An IEP is not required to be in place until the beginning of the school year. 34 C.F.R. §

300.323 (2009). Plaintiffs offer no legal requirement that the IEP or BIP be presented at the IEP

meeting, nor at any time before the school year begins. Therefore, it is apparent to the court that

the IEP, including the BIP, were developed with the required parental input and presented to

plaintiffs within the required time period. The SRO's decision is sustained as to this issue.

Second, plaintiffs assert that defendant failed to discuss at the IEP meeting that F.L.'s

current school used the ABA methodology, whereas P.S. 138 used TEACCH.[10] Pls.' Mem. 13–

14. Plaintiffs do not point to any statutory or regulatory support establishing a requirement that

their preferred teaching methodology be considered in the development of an IEP.[11]  Indeed, the

Fourth Circuit has held that "[n]either a state administrative hearing officer nor a reviewing court

may reject an otherwise appropriate IEP because of dissatisfaction with the educational

methodology." *Cnty. Sch. Bd. v. R.P. & N.M.P. ex rel. Z.P.*, 399 F.3d 298, 308 (4th Cir. 2005);

---

[10]    The record indicates that the largest difference between ABA and TEACCH is that ABA provides more 1:1 instruction. Tr. 522–26, 572–73, 891–92. The IEP developed at the meeting provided for an individual behavior management paraprofessional to provide full-time 1:1 instruction. Pl.'s Mem. Ex. D, at 9.

[11]    Plaintiffs reference two district court cases in which ABA and TEACCH are discussed, both of which have recently been affirmed. *R.K.*, 2011 WL 1131492, *aff'd*, 2012 WL 4125833; *M.H. & E.K. ex rel. P.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125 (S.D.N.Y. 2010), *aff'd*, *M.H.*, 685 F.3d 217 (2d Cir. 2012). While both cases have results favorable to the objecting parents, neither is directly applicable to this case. *M.H.* stands for the proposition that if the Department presents evidence of educational methodology before an IHO, the plaintiffs should be able to address methodology even if it was not argued in their due process complaint. *M.H.*, 685 F.3d at 252. *R.K.* found that the student's required level of 1:1 support was not sufficiently provided for by the TEACCH program at the offered school. *R.K.*, 2011 WL 1131492.

*see also Rowley*, 458 U.S. at 207 ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States."). Because parents are not entitled to choose an educational methodology under the IDEA, and because F.L.'s mother was involved in the IEP discussions, the Department's purported failure to address the use of the TEACCH methodology at P.S. 138 is not a procedural violation.

Third, plaintiffs assert that defendant failed to address a transition plan at F.L.'s IEP meeting. Plaintiffs insist that this is a procedural violation, even though they do not cite to any law entitling them to a transition plan in the IEP.[12] This failure to cite any law in their favor probably results from an absence from the statute of the requirement plaintiffs insist upon. Indeed, under the IDEA, unless the statute explicitly requires certain information be included in the IEP, it cannot be otherwise required. 20 U.S.C. § 1414(d)(1)(A)(ii) ("Nothing in this section shall be construed to require . . . that additional information be included in a child's IEP beyond what is explicitly required in this section."). In addition, both the IHO and SRO found that the school had transition services in place to address F.L.'s needs. SRO Decision 19 ("[T]he hearing record reflects that the district would have provided for transition services in order to facilitate the student's placement in the assigned school."); IHO Decision 19. This determination is

---

[12]      Plaintiffs cite to *R.E.* to support this point, but *R.E.* does not help their argument because the only reference to transition plans is to a defendant's representation that transition plans are not required in the IEP. *R.E. & M.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 785 F. Supp. 2d 28, 34 (S.D.N.Y. 2011) ("*R.E. I*") ("According to the [Department], no federal or state law requires a school district to include such a [transition] plan in a student's IEP when the student is moving from one elementary school to another."). Furthermore, *R.E.* was recently reversed by the Second Circuit, which found that R.E. had been offered a FAPE. *R.E. II*, 2012 WL 4125833, at *19. In that decision, the Second Circuit also found that another student's "parents also challenge[d] the IEP's lack of a transition plan, but they have not identified any legal requirement that an IEP contain a transition plan, nor have they articulated why the absence of such a plan was so significant as to deny [the student] a FAPE." *Id.* at *22.

justified by the record testimony[13] of Kathy Kaufman, a school psychologist with the

Department:

> We have a program, and within our program they do deal with transition. A 6:1:1
> class does deal with transition. They have—it's all students with autism and they
> all have difficulty transitioning. And there are many students who come into our
> programs all the time, and it's programmatic. They do have it set up. In addition
> to that, he does have a behavior management paraprofessional who is there to
> assist with any transitioning, as well.

Tr. 585–86. Based on the foregoing, the absence of a transition plan in the IEP document does

not constitute a procedural violation.

Fourth, plaintiffs assert that defendant failed to discuss or offer parent counseling or

training[14] in violation of New York State Regulations. *See R.E. II*, 2012 WL 4125833, at *17

("New York regulations require that an IEP provide for parent counseling and training for the

parents of autistic children.") (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(d)). Under

N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(kk), "[p]arent counseling and training means

assisting parents in understanding the special needs of their child; providing parents with

information about child development; and helping parents to acquire the necessary skills that will

allow them to support the implementation of their child's [IEP]."

Here, the record shows that parent training was discussed at the IEP meeting. Tr. 96

("We explained that District 75—a District 75 program provides parent training."), 650. Further,

---

[13]     This testimony is permissible under *R.E. II* as "testimony regarding the services
described in the student's [IEP]," *R.E. II*, 2012 WL 4125833, at *2; *see also id.* at *12
("[T]estimony regarding state-offered services may only explain or justify what is listed in the
written IEP.").

[14]     Although plaintiffs address this as a procedural violation, there is some authority
that this should be considered a substantive claim. *See T.Y. & K.Y. ex rel T.Y. v. N.Y.C. Dep't of
Educ.*, 584 F.3d 412, 418–19 (2d Cir. 2009). The distinction is important. Procedural claims are
to be assessed for conformity with the procedures laid out in IDEA. Substantive claims are to be
assessed to determine whether the IEP is "reasonably calculated" to provide the student with
educational benefits. Not every individual action by the Department must be "reasonably
calculated"; indeed, only the program laid out in the IEP must be "reasonably calculated."

while it is clear that parent training must be provided as part of the educational placement under the New York Regulations, it is not clear that it must be specified in the IEP. *See R.E. II*, 2012 WL 4125833, at *17 ("Although violating New York's regulations, the failure to include parent counseling in the IEP is less serious than the omission of an FBA. . . . [B]ecause school districts are required by section 200.13(d) to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP.").

Defendant cites to three Southern District of New York cases,[15] one of which was recently affirmed by the Second Circuit, each indicating that the failure to provide for parent training in an IEP does not result in the denial of a FAPE when the Department's proposed educational placement provides parent training. *See E. Z.-L.*, 763 F. Supp. 2d at 597–98, *aff'd*, 2012 WL 4125833 (finding that failure to include parent training and counseling in an IEP does not result in a FAPE deprivation when the proposed placement, in fact, provided parent training); *M.N. & H.N. ex rel. J.N. v. N.Y.C. Dep't of Educ.*, 700 F. Supp. 2d 356, 368 (S.D.N.Y. 2010); *M.M. & H.M. ex rel. A.M. v. N.Y.C. Dep't of Educ.*, 583 F. Supp. 2d 498, 509 (S.D.N.Y. 2008). These three cases address section 200.13(d), and reject the argument that failure to provide a specific provision for parent training in the IEP amounts to a denial of a FAPE when there is evidence on the record that such training is available. Indeed, as the Second Circuit recently found, "[t]hough the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary

---

[15]     Plaintiffs also assert that *Danielle G.* controls, and that because parent counseling was not detailed in F.L.'s IEP, the Department did not offer him a FAPE. *Alexander & Laura G. ex rel. Danielle G. v. N.Y.C. Dep't of Educ.*, No. 06-CV-2152, 2008 WL 3286579, at *14 (E.D.N.Y. 2008) ("[P]arental counseling services provided to [plaintiff's] parents should have been detailed in [plaintiff's] IEP."). In *Danielle G.*, however, parent training was not provided at all, and the SRO did not address the issue. *Id.* at *14.

case that failure, standing alone, is not sufficient to warrant reimbursement." *R.E. II*, 2012 WL 4125833, at *17.

Here, although it is undisputed that F.L.'s IEP did not include any specific provision for parent training, both the IHO and the SRO found that parent training was, in fact, offered. SRO Decision 20 ("[G]iven that parent counseling and training was available at the assigned school, the district's failure to incorporate it into the challenged IEP did not result in any substantive harm, nor did it, in this case, rise to the level of a denial of a FAPE to the student."); IHO Decision 20. Thus, this case is most similar to *R.E. II*, in which the Second Circuit "conclude[d] that the failure to include parent training in the IEP did not rise to the level of a denial of a FAPE, even when considered cumulatively with the deficiencies in the FBA." *R.E. II*, 2012 WL 4125833, at *19. Therefore, the court finds that parent counseling services were, in fact, available at P.S. 138, and, therefore, that F.L. was not denied a FAPE because the IEP lacked a written provision regarding parent training.

Fifth, plaintiffs assert that defendant was required to, but failed to, include them in the selection of a specific school placement. In their argument, plaintiffs confuse two distinct definitions of the term "placement": (a) educational placement, i.e., the academic program to which the student is assigned; and (b) school placement, i.e., the specific location to which the student is assigned. *T.Y. & K.Y. ex rel. T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009) ("'Educational placement' refers to the general educational program—such as the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school."). Parents are entitled to participate in any decision regarding the educational placement of their child. Parents are not, however, procedurally entitled to participate in the decision regarding school placement. *Id.* at 420 ("[B]ecause there is no

requirement in the IDEA that the IEP name a specific school location, T.Y.'s IEP was not procedurally deficient for that reason. We emphasize that we are not holding that school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements. We simply hold that an IEP's failure to identify a specific school location will not constitute a *per se* procedural violation of the IDEA.") (citations omitted); *see also R.E. II*, 2012 WL 4125833, at *18 ("The Department may select the specific school without the advice of the parents so long as it conforms to the program offered in the IEP.").

In support of their placement argument, plaintiffs also assert that defendant is bound by the *Jose P.* consent decree. Stipulation, *Jose P. et al. v. Sobol et al.*, Nos. 79 C. 270, 79 C. 560, 79 C. 2562 (E.D.N.Y. July 28, 1988) (attached as Pls.' Mem. Ex. E) ("*Jose P.* Decree"). In *Jose P.*, a class of parents sued the New York City Department of Education alleging a failure to timely evaluate and place disabled children. The case concluded in a consent decree that provided the children's parents with specific rights with respect to the selection of school placement sites. *See Jose P.* Decree. If defendant were bound by the decree, plaintiffs would have additional rights, including the rights to meet with a placement officer, discuss specific school placement sites, and obtain information about the ages and functional levels of the students in each class being considered. *Jose P.* Decree 27–30.

*Jose P.*, however, is inapplicable to this case. First, "a consent decree can be enforced only by a party, a party's privy, or an intended beneficiary" involved in the action. *E. Z.-L.*, 763 F. Supp. 2d at 594, *aff'd*, 2012 WL 4125833 (quoting *M.S. & J.S. ex rel. M.S. v. N.Y.C. Dep't of Educ.*, 734 F. Supp. 2d 271, 279 (E.D.N.Y. 2010)); *see also P.K. & T.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, 819 F. Supp. 2d 90, 101 n.3 (E.D.N.Y. 2011) ("In any event, an allegation that the *Jose P.* consent decree has been violated should be raised in the *Jose P.* action." (citing *W.T.*

21

*& K.T. ex rel. J.T. v. Bd. of Educ. of Sch. Dist. of N.Y.C.*, 716 F. Supp. 2d 270, 290 n.15
(S.D.N.Y. 2010))). Thus, it has been held that violations of the *Jose P.* consent decree must be
raised in the court that entered the order, not this court. *P.K.*, 819 F. Supp. 2d at 101 n.3.

In addition, plaintiffs' *Jose P.* argument has previously been rejected in similar cases.
*R.K.*, 2011 WL 1131492, at *16, *aff'd*, 2012 WL 4125833 ("Equally makeweight is plaintiffs'
contention that the [Department's] failure to abide by a consent order in *Jose P.* . . . constitutes
'an *independent* basis for a . . . FAPE deprivation.' According to plaintiffs, the *Jose P.* consent
order requires a [Department] placement officer to attend the student's IEP meeting and to offer
a site by the end of the meeting, but for exceptional circumstances. Plaintiffs further fault the
[Department] for failing to disclose the *Jose P.* consent order at the administrative hearing.
These arguments have been previously been rejected by the courts, including the Southern
District of New York in *W.T.*" (citing *W.T.*, 716 F. Supp. 2d at 290 n.15)).

In addition, F.L. does not fall into the class of plaintiffs to which *Jose P.* applies. "The
*Jose P.* consent decree was signed between the Department and a class of plaintiffs who
complained of the Department's failure to timely evaluate and place children in special education
programs." *M.S.*, 734 F. Supp. 2d at 279. Plaintiffs do not allege that F.L. was not evaluated or
placed in a timely manner. Rather, they claim that the consent decree "is unequivocally
applicable and controlling on the placement *situs* selection issue, without regard to what the
[IDEA] statute or related regulations require." Pls.' Mem. 24. In so arguing, however, plaintiffs
fail to address how the 1988 consent order should bind this court in place of recent Second
Circuit precedent. "[T]he *Jose P.* consent order does not alter the Second Circuit's (subsequent)
holding in *T.Y.* that an IEP need not identify a specific school site." *R.K.*, 2011 WL 1131492, at
*17, *aff'd*, 2012 WL 4125833 ("Plaintiffs articulate no rationale as to why a court-approved

settlement in a 1979 case should somehow supersede a decision of the Second Circuit in 2009 holding that an IEP's failure to identify a specific school does not constitute a FAPE deprivation."); *see also T.Y.*, 584 F.3d at 419 ("[T]he requirement that an IEP specify the 'location' does not mean that the IEP must specify a specific school site."); *R.E. II*, 2012 WL 4125833, at *18 n.5 ("[T]he certified class in *Jose P.* encompassed 'all handicapped children between the ages of five and twenty-one living in New York City . . . who have not been evaluated within thirty days or placed within sixty days of [notification to the Department].' Since the plaintiffs in these cases were timely evaluated, the *Jose P.* stipulation does not apply to them." (citations omitted)).

Based on the foregoing, the court finds that the preponderance of the evidence demonstrates that the Department procedurally complied with the requirements of the IDEA. In reaching these conclusions, the court agrees with both the SRO and IHO decisions as to the procedural adequacy of F.L.'s IEP. Having concluded that the Department complied with the procedures in the IDEA, it is next necessary for the court to address the second factor of the Prong I analysis of the *Burlington/Carter* test, the substantive adequacy of F.L.'s IEP.

### B. Substantive Adequacy

Plaintiffs assert that defendant failed to provide an IEP "reasonably calculated" to confer educational benefits upon F.L. in the following ways: (1) by allowing Department employees with no direct contact with F.L. or his parents to determine F.L.'s specific school placement;[16] (2) by placing F.L. in a class with higher-functioning children; (3) by placing F.L. in a school

---

[16]    Plaintiffs address this as a substantive violation, but it seems apparent that their grievance is procedural because they are disputing the procedures the Department followed in assigning F.L. to a specific school.

23

that uses TEACCH rather than ABA methodology; and (4) by placing F.L. in a school that could not fulfill the "related services" mandate in his IEP. Pls.' Mem. 16–18.

First, plaintiffs argue that the IEP was not "reasonably calculated" to confer educational benefits because Department employees with no direct contact with F.L. or his parents determined F.L.'s specific school placement. Pls.' Mem. 16–17. Plaintiffs' argument misconstrues the "reasonably calculated" test. The test refers to the substance of the IEP, rather than to the manner in which each decision was reached. This being the case, it is not surprising that plaintiffs cite no law requiring the school placement decision to be made by a person familiar with the student or in attendance at the IEP meeting.[17] The fact that the school placement officer did not have direct contact with F.L. or his parents is, therefore, immaterial and does not constitute a substantive violation of the IDEA's requirement that the IEP be "reasonably calculated" to provide the student with educational benefits.

Second, plaintiffs maintain that the IEP was deficient because it placed F.L. in a classroom with higher-functioning students. There is, however, little evidence to support the assertion that the proposed classroom would have contained higher-functioning students. Indeed, the IHO and SRO both found that the evidence did not support this allegation. SRO Decision 23 ("As indicated herein, the hearing record supports the [IHO's] determination that the evidence did not support th[e] allegation [that F.L. would be placed with higher-functioning students] (IHO Decision at p. 19). In July 2009 the assigned 6:1+1 special class consisted of five students with autism (Tr. p. 205, see Tr. p. 305). The students ranged in age from 10 through 12 years old, and their instructional levels in reading and math ranged from early first grade through

---

[17]     Though it is not entirely clear from plaintiffs' argument, they may be attempting to rely on the *Jose P.* consent decree, which, in theory, would give them the right to speak with the placement officer. As noted, however, *Jose P.* is inapplicable to this case.

early second grade (Tr. pp. 205–06, 241–42). At the time of the May 2009 CSE meeting, [F.L.] was 11 years old and he demonstrated first grade skills in math and late first through early second grade skills in word identification/decoding, reading comprehension, and writing (Dist. Ex. 2 at pp. 1, 3–4). Within the 6:1+1 special class, there were three verbal and two nonverbal students (Tr. p. 206). With respect to [F.L.'s] verbal skills, he produced up to five word phrases. (Dist. Ex. 9 at p. 2). The district's special education teacher of the assigned class testified that the student would have been a 'good candidate' for the 6:1+1 special class based on his strengths, needs, annual[] goals, performance characteristics, and age (Tr. pp. 206–07). Based on the foregoing, I am persuaded that the student could have been suitably grouped for instructional purposes within the 6:1+1 special class."); *see also* IHO Decision 19.

The only support plaintiffs offer to demonstrate that F.L. would be placed with higher-functioning students is testimony from F.L.'s mother based on her single hour-and-a-half visit to P.S. 138. Pls.' Mem. 17. Other evidence indicates that the students in the class were performing at a similar grade level to F.L. Tr. 240, 242 (describing the "grade spelling level range of the children in [the placement] class" as "upper first grade and lower second grade," and the math level as "lower first grade to a higher second grade"); Pls.' Mem. Ex. D, at 3-1–3-2 (listing F.L.'s "instructional level" as "late 1st to early 2nd [grade]"). Particularly in light of this substantial evidence, and based upon the court's independent review of the administrative record using a preponderance of the evidence standard, F.L.'s mother's testimony as to the functioning of other students is insufficient to warrant a finding that F.L.'s IEP was not "reasonably calculated" to confer educational benefits. *Rowley*, 458 U.S. at 206. Furthermore, just as the

25

Department may not rely on retrospective testimony[18] concerning the services that F.L. would have received had the parents accepted the proposed placement, the parents cannot rely on observations of a particular teacher or classroom because there is no guarantee that F.L. would have been placed in the classroom visited by M.L.[19] Therefore, the SRO's determination with respect to this issue is sustained.

Third, plaintiffs argue that the IEP was deficient because the offered placement uses the TEACCH methodology, rather than the ABA methodology. As noted, the main difference between the TEACCH and the ABA methodologies is the amount of 1:1 contact the student receives. Tr. 522–26, 572–73, 891–92. The ABA methodology provides constant 1:1 contact, whereas the TEACCH methodology encourages the student to work independently. The program offered in F.L.'s IEP, however, provided for constant 1:1, full-time contact with a behavior management paraprofessional. Pls.' Mem. Ex. D, at 6-15–7, 9. While the parents object that the paraprofessional assigned to F.L. would not be required to have a bachelor's degree, "[t]he adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is

_____

[18]    In *R.E. II*, the Second Circuit limited the Department's ability to rely on "retrospective testimony" which it described as "testimony from Department personnel about the educational program the student would have received if he or she had attended public school." *R.E. II*, 2012 WL 4125833, at *1. While the parents in that case "urge[d] [the Court] to adopt a rigid 'four corners' rule prohibiting any testimony about services beyond what is written in the IEP," the Court declined to do so, stating "[a]lthough we decline to adopt a four corners rule, we hold that testimony regarding state-offered services may only explain or justify what is listed in the written IEP. Testimony may not support a modification that is materially different from the IEP, and thus a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP." *Id.* at *12. Here, the SRO's reliance on the testimony of the special education teacher is acceptable as far as it describes the substance of the assigned 6:1:1 program.

[19]    As part of its holding in *R.E. II*, the Second Circuit also stated that "[t]he prospective nature of the IEP also forecloses the school district from relying on evidence that a child would have had a specific teacher or specific aide. . . . The appropriate inquiry is into the nature of the program actually offered in the written plan." *R.E. II*, 2012 WL 4125833, at *13.

precisely the kind of educational policy judgment to which we owe the state deference if it is supported by sufficient evidence." *R.E. II*, 2012 WL 4125833, at *19.

Plaintiffs also do not cite to any law requiring the school to use a particular methodology. Nor do they offer any evidence that the ABA methodology is better suited to F.L., other than that the ABA methodology is the one F.L. has become accustomed to at the McCarton School. Thus, despite plaintiffs' arguments to the contrary, this case is different from *M.H.* where the Court found that the hearing officer had not taken into account "significant evidence in the record" that demonstrated that a student "required intensive 1:1 instruction," making the ABA methodology more appropriate in that case. *M.H.*, 685 F.3d at 252.

Here, the record indicates that the TEACCH methodology has been shown to work for many children with autism, even for those previously educated using the ABA method. Tr. 139–40, 202. The Department, the IHO, and the SRO all found that TEACCH was an appropriate methodology for teaching students with autism. SRO Decision 22 ("Although it is understandable that the parents may have preferred a different educational methodology or strategy upon the implementation of the student's IEP, in view of the forgoing evidence, I decline to hold that the failure to provide the student with an ABA methodology in the proposed classroom in this case resulted in a denial of a FAPE."); IHO Decision 19 ("[T]here was no evidence submitted at this hearing that would establish that ABA is the only methodology that is effective for autistic children. Moreover, the parents have no right under IDEA to dictate to the [Department] the teaching methodology that is to be used for their child."). These findings must be afforded some deference. *Rowley*, 458 U.S. at 207–10 ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States."). Thus, the court agrees with the SRO and IHO decisions as to this issue, and finds that the use of TEACCH

methodology at P.S. 138 does not warrant a finding that the IEP was not "reasonably calculated to confer educational benefits" on F.L.

Fourth and finally, plaintiffs argue that the IEP was deficient because the offered school could not provide the "related services" mandate in F.L.'s IEP, i.e., the speech/language therapy and the occupational therapy sessions. This argument is presumably based on language in *T.Y.*, 584 F.3d at 420 ("[W]e are not holding that school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements."). This is the only issue upon which the IHO and SRO disagreed. The IHO found that P.S. 138 would have been unable to provide a "major portion" of F.L.'s related services mandate in speech/language therapy and occupational therapy. IHO Decision at 21–22. As a result, the IHO awarded plaintiffs reimbursement for those services. The SRO, however, found that "the hearing record does not support a finding that related services were unavailable at the assigned school, or that the district would have denied the student a FAPE under the circumstances of this case," thus reversing the IHO's award. SRO Decision 26.

Plaintiffs rely on two Special Education Service Delivery Reports, which contain summary data reporting P.S. 138's ability to meet its students' related services mandates, to show that the school would have been unable to fulfill F.L.'s related services mandate. Pls.' Mem. Ex. F. Plaintiffs claim that the May 20, 2009 Report indicates that 10.7% of students requiring speech therapy and 37.1% of students requiring occupational therapy were not receiving their full service mandates at P.S. 138 in 2008–09. Pls.' Mem. Ex. F, at 2. A subsequent Service Delivery Report indicates that as of May 28, 2010, 6.2% of students requiring speech therapy and 20.6% of students requiring occupational therapy were not receiving their full mandates at the school. Pls.' Mem. Ex. F, at 3. While plaintiffs asset that

28

these reports indicate that there was some chance that an entering student such as F.L. would not have received his entire mandate, there are several reasons why the reports should be afforded limited weight.

As the SRO noted, "data indicating that a school has not always delivered full special education services to its students does not mean that the school would have been unable to provide the services to another student whose IEP is being challenged in a due process proceeding." SRO Decision 25 (citing *M.S.*, 734 F. Supp. 2d at 279 ("The summary data in the Special Education Service Delivery Report indicate that [the school] has not always delivered full special education services to all of its students who require them, but this bare fact does not mean that the school would have been incapable of providing the services to [the student] required by his IEP.")). Furthermore, as the Second Circuit has recently clarified,

> Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement. A suggestion that some students are underserved cannot overcome the 'particularly important' deference that we afford the SRO's assessment of the plan's substantive adequacy. An IEP need only be reasonably calculated to provide likely progress.

*R.E. II*, 2012 WL 4125833, at *21 (citations omitted).

The SRO also identified record testimony undermining plaintiffs' arguments regarding P.S. 138's purported inability to meet the requirements of F.L.'s related services mandate. SRO Decision 25–26 ("[F]urther review of the hearing record provides strong support for the conclusion that the staff at the assigned school would have implemented the related services recommendations on the student's May 2009 IEP had he attended the assigned school. The related services coordinator testified that the student would have received all of his related services had he attended the assigned school in July 2009 (Tr. p. 372). The related services coordinator added that students obtained their related services through district providers and

29

contracted with outside providers as needed (Tr. pp. 312, 344–45, 359, 361–62). Furthermore,

[an] assistant principal [] testified that the district's related services providers collaborated with

the outside related services providers when a student received related services from an outside

provider (Tr. p. 151). Additionally, the hearing record reflects that the related services

coordinator provided parents with an [Related Services Authorization ("RSA")] and a list of

related services providers when outside providers were not available (Tr. p. 312). The related

service coordinator stated that RSAs were provided to parents in an effort 'to take that burden off

. . . parent[s]' (Tr. p. 419). Moreover, the related service coordinator provided assistance to

parents with the RSA process, including contacting related service provider agencies (Tr. pp.

418–20). The assistant principal . . . testified that, although the special education service reports

in evidence at the impartial hearing indicated that students were und[er]served, the student in the

instant matter would not have been underserved because his related services would have been

arranged through outside providers, if needed (Tr. p. 342). Lastly, [the SRO] note[d] that

testimony from the district's special education teacher reveals that all of his students from the

2009–10 school year received their related services from district providers (Tr. pp. 226, 289). In

sum, the hearing record does not support a finding that related services were unavailable at the

assigned school, or that the district would have denied the student a FAPE under the

circumstances of this case, even if the district had to issue an RSA to the student to complete the

provision of the related services listed on the May 2009 IEP due to a shortage of district

providers.").

    Plaintiffs make much of an admission by assistant principal Greg Soullette that the P.S.

138 staff would have been unable to fulfill all of F.L.'s mandate. Pls.' Mem. 8; Tr. 156–57.

Plaintiffs, however, ignore other portions of Mr. Soullette's testimony: "[W]e fulfill all the

mandates . . . based on outside agencies. They weren't Department of Ed employees. They were outside agencies that fulfilled the mandates of the students that our Department of Ed employees could not fulfill." Tr. 150. This testimony effectively negates plaintiffs' argument that "Mr. Soullette fairly admitted that P.S. 138 would have been <u>unable</u> to provide F.L. with the amount of speech and language therapy mandated in his proposed IEP." Pls.' Mem. 8 (emphasis in original). In context, it is apparent that Mr. Soullette indicated that F.L.'s mandate would have been met, albeit not entirely by internal P.S. 138 staff.

The SRO cited to further evidence that the service deficits noted in the 2009 Service Delivery Report did not accurately reflect the proportion of students who were not getting their mandates fulfilled. Specifically, the SRO pointed to the testimony of assistant principal Gaffney and related services coordinator Ms. Guarino that students received their mandated services through district providers, but that outside providers would be used as needed to fill in any gaps in service. SRO Decision 25 (citing Tr. 312, 344–45, 359, 361–62). Mr. Gaffney explained that, even if neither in-house staff nor outside contractors could satisfy the mandates in the school, the school would provide parents with RSAs with which they could obtain services outside of the school. Tr. 312.

Plaintiffs insist that it can be difficult to fulfill these RSAs. Pls.' Mem. 10. Indeed, Mr. Soullette testified that it is sometimes difficult for parents to find related services providers. Tr. 155–56. Plaintiffs characterize this testimony as indicating that if they were to be issued RSAs, F.L. would not receive services. The IHO assigned great weight to this testimony. In reversing the IHO, however, the SRO recognized that there were steps in place should the school be unable

31

to meet F.L.'s mandate with in-house staff.[20]  SRO Decision 25–26.  It is apparent from the record that finding related services providers to fulfill these RSAs can be difficult for parents. Tr. 155–56, 370–71.  But it is also clear that the Department has recognized this difficulty and, as a response, offers assistance to parents receiving RSAs to deal with related services delivery deficits so parents will not have to face this potentially difficult situation on their own.  Tr. 416–20.

Several factors argue in favor of deference to the SRO decision on this issue, beyond the general deference due to the final administrative determination.  First, the Department's ability to fulfill the related services mandates is relevant to substantive adequacy, rather than procedural compliance, and is therefore entitled to greater weight.  *M.H.*, 685 F.3d at 244.  Second, the SRO decision is more thorough, logically-reasoned, and complete than the IHO decision, so it is entitled to more deference than the IHO decision.  *Id.*  Third, this court's review is based on the same evidence that was before the SRO, so his decision should be afforded great deference.  *Id.* Finally, when the SRO and the IHO decisions are in conflict, it is generally the SRO's decision that will be entitled to deference.  *Id.*

In sum, the court agrees with the SRO's decision regarding the substantive adequacy of F.L.'s IEP.  The Department's selection of an educational placement site resulted in a placement that was "reasonably calculated" to provide F.L. with educational benefits, regardless of whether the placement officer had direct contact with F.L. or his parents.  Despite plaintiffs' argument

---

[20]     Specifically, related services, such as speech/language and occupational therapy, are provided in accordance with a three-step process at P.S. 138.  First, the school attempts to provide the services with in-house staff.  Tr. 362.  Second, if the in-house services are unsatisfactory, the school will contract with outside therapists to provide the services in the school.  Tr. 362.  Third, if the first two options are inadequate, the school will work with the student's parents to have the services provided outside of the school environment by external therapists.  Tr. 362–63, 416–20.

that the other students in F.L.'s proposed classroom were higher-functioning, the evidence on the record does not warrant overturning the findings of both the SRO and IHO that F.L.'s functional grouping would be appropriate. P.S. 138's use of the TEACCH methodology rather than ABA was an educational policy decision that this court will not disturb on the facts of this case. Finally, the court finds that the SRO decision is entitled to greater deference than the IHO decision on the issue of P.S. 138's ability to deliver F.L.'s related services, and that the record evidence supports the SRO's conclusions. Consequently, after independently reviewing the record and applying the deferential standard of review, the court concludes that the SRO's determination was supported by a preponderance of the evidence, was correct in determining that F.L.'s IEP was "reasonably calculated" to provide him with educational benefits, and was, therefore, substantively adequate.

## CONCLUSION AND ORDER

The New York City Department of Education offered F.L. a Free Appropriate Public Education, both procedurally and substantively. Because the Department offered F.L. a FAPE, Prong I of the *Burlington/Carter* test is satisfied and it is unnecessary for the court to address the appropriateness of the parents' unilateral placement or the balance of the equities.

For the foregoing reasons, plaintiffs' motion for modified de novo review is DENIED, defendant's motion for summary judgment is GRANTED, and the State Review Officer's decision is sustained.

/S/       Richard K. Eaton
                   Judge

Dated: October 16, 2012
       New York, New York

33